UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT LEXINGTON
CIVIL ACTION NO. 03-197-KSF

ALAN ERNEST,                                            PLAINTIFF

V.

THE BOURBON COUNTY BOARD OF
EDUCATION, et al.,                                      DEFENDANTS

## REPORT & RECOMMENDATION

This litigation was initiated by plaintiff Alan Ernest ("Ernest") to protest the termination of his employment contract with the Bourbon County School district by Superintendent Woodrow Carter ("Carter") on or about January 7, 2002.  The matter was referred to the undersigned magistrate judge to conduct a post-termination due process hearing and issue a report and recommendation.  28 U.S.C. §636(b).

### I.  Factual and Procedural Background

On November 1, 2004, the district court entered an Order staying defendants' motions for summary judgment and granting partial summary judgment to plaintiff on plaintiff's procedural due process claim.  On December 29, 2004, the court entered an Opinion and Order denying the school board's motion to alter, amend, and directing the Board to provide plaintiff

with a due process hearing before a neutral and impartial decision maker by a date certain.[1]   The court simultaneously granted in part defendant Woodrow Carter's motion to alter or amend, dismissing with prejudice plaintiff's claims against defendant Woodrow Carter in his individual capacity.

The background surrounding plaintiff's termination was previously set forth by the district court:

> In December 1997, plaintiff Alan Ernest ("Ernest") began working as an aide for the Bourbon County Board of Education (the "Board").  Ernest was then selected as the director of the Board's Continuous Learning Center ("CLC") for the 1998-1999 school year.  The CLC provides extra assistance to students with disciplinary problems.  Ernest continued as director of the CLC through the 2001-2002 school year.
> On September 12, 2001, students K.W. and J.M. were involved in an altercation at the CLC.  During the altercation, Ernest intervened in an attempt to prevent the altercation from escalating.  There is some dispute as to the actions Ernest took in response to the altercation.  Ernest claims that he grasped K.W. on two separate occasions in a bear hug in an effort to calm K.W. down.  On the other hand, the Board asserts that Ernest either pushed or slammed K.W. against the wall and took KW to the ground twice.  The altercation, including Ernest's involvement, were captured on video tape. . . ..
> Superintendent Woodrow Carter ("Carter") was apprised of the September 12, 2001 incident.  An Admissions and Release Committee ("ARC") meeting was convened on September 13, 2001 to address the incident.  Carter issued a show cause letter to Ernest, who filed a response on September 25, 2001.  During the interim, Carter asked that John Beardsley

---

[1]The original January 17, 2005 deadline was subsequently extended to accommodate the schedule of all parties.

("Beardsley"), director of special education, and
Orin Simmerman ("Simmerman"), assistant
superintendent, conduct an investigation into the
matter.  Beardsley and Simmerman reviewed the video
tape of the incident and interviewed a number of
witnesses.  After reviewing Ernest's response and
Beardsley and Simmerman's report, Carter notified
Ernest that he was terminating Ernest's contract,
subject to Ernest's request for a hearing.

DE #44, Order of 11/1/04.

On October 17, 2001, Ernest requested a due process

hearing.

The hearing, held on November 16, 2001, was presided over by

Superintendent Carter.  Ernest objected to Carter serving as

the hearing officer.  On January 7, 2002, Carter presented a

termination letter to Ernest.

In this court's November 1, 2004 order, the district

court determined that plaintiff had a property interest in

continuing his one-year contract to its completion, although

the Board was free not to renew that contract at the end of

the term for any reason.  The court relied in part on KRS

§161.011(7), which specifies that employees cannot be

terminated in the midst of their contracts absent

"incompetency, neglect of duty, insubordination, inefficiency,

misconduct, immorality, or other reasonable grounds which are

specifically contained in board policy."  The court noted that

plaintiff's contract permitted termination "for any reason

3

with two weeks notice," but that it was undisputed that the Board did not give plaintiff two weeks notice.  Therefore, the court concluded that plaintiff could only be terminated for cause under KRS §161.011(7).

The district court held that Ernest's post-termination hearing, heard and decided by Superintendent Carter, violated Ernest's due process rights because it was not before a neutral decision maker.  The parties subsequently agreed to have the undersigned magistrate judge serve as the "neutral decision maker" for purposes of satisfying due process concerns.  A full due process hearing was conducted on Monday, February 7, 2005 in Lexington, Kentucky, which proceedings were recorded by Official Court Reporter Peggy Weber.  Both parties filed post-hearing briefs.

## II.  Purpose of the Post-Termination Hearing

Counsel agreed that the scope of the hearing was to be "de novo."  At the hearing, both parties presented new evidence not previously presented at the pre-termination hearing before the Superintendent, on grounds that the new hearing was to be a "true de novo hearing" where the parties would be "starting over" with their proof.

Both counsel concur that the undersigned must determine whether the actions of Mr. Ernest constituted "incompetency,

4

neglect of duty, insubordination, inefficiency, misconduct, immorality, or other reasonable grounds which are specifically contained in board policy" in violation of KRS §161.011(7). In making this determination, the court must consider whether plaintiff's actions on September 12, 2001 constituted safe physical management, and/or whether plaintiff properly "de-escalated" the situation with student KW.

If the court first concludes that plaintiff's actions violated KRS §161.011, the defendants next would have the court determine whether termination was a permissible or justifiable punishment for plaintiff's actions.  By contrast, plaintiff would have the court determine what punishment, if any, should have been imposed.

In determining the scope of the post-termination hearing, I have been guided by the procedures set forth in KRS §§13B.080 and 13B.090 as well as KRS §161.790.  *See also Brooks v. Burks,* Lexington Civil Action No. 98-312 (E.D. Ky 2000)(unpublished); *Blevins v. Russell Bd. Of Ed.,* Ashland Civil Action NO. 00-155-HRW, (E.D. Ky. 2003)(unpublished). The defendants were required to prove the propriety of their action by a preponderance of the evidence.  *See* KRS §13B.090(7).

**III.  Findings**

5

Having heard testimony and having reviewed all evidence presented at the February 7, 2005 hearing, I conclude that the defendants have not met their burden of showing a violation of KRS §161.011(7).  Because I have answered the first question in the negative, it follows that no punishment was warranted and that early termination of the plaintiff's one-year contract was not justified.

Alan Ernest was employed as the Coordinator of the Continuous Learning Center ("CLC"), a position which required as a qualification a "background in law enforcement or related field."  Ex. 2.  Mr. Ernest has a background in law enforcement, having worked for the FBI and on the Lexington police force for a number of years.

The CLC is an "alternative school" for children ranging in age from 12-19 who have been expelled or suspended from other area schools.  Students attend the CLC for varying lengths of time, ranging from just a few days to long-term stays of six weeks or longer.

KW had been a long-term student at the CLC since September of 2000, having been suspended from his local high school for behavior problems.  Ex. 3.  Due to increasingly defiant and occasional violent behaviors, the staff psychologist at the CLC formulated a "Behavior Intervention

6

Plan," dated March 28, 2001.  The Behavior Intervention Plan appears primarily designed to address disruptive classroom behaviors such as:

> verbal arguing, enlisting the aid of other students to provide distractions, cursing, being disrespectful of both students and teachers (i.e., name calling, hurtful comments, etc.), and defiance (i.e., refusing to leave the classroom when asked, refusing to work on assignments, etc.)

If a teacher observed a disruptive classroom behavior, they were to give a verbal warning, give time (approximately 10 seconds) to respond, and then "remove him from the classroom." If KW did not leave the classroom voluntarily, the staff member was to call for assistance, remove all other students from the classroom, leaving KW alone in the room with supervision until he left of his own accord.

A separate section of the Behavior Intervention Plan deals with situations in which KW becomes violent "defined as hurting someone, throwing tables or chairs, threatening with a weapon, or threatening to leave the premises."  In that situation, the Behavior Intervention Plan instructs the staff member to call Impact, call Terry Pollitt (campus security), and/or to call the Paris Police Department.

A Behavior Intervention Plan is ordinarily required to be adopted and approved by the ARC.  In this instance, KW's Behavior Intervention Plan was distributed to teachers and

7

other staff members, including to Alan Ernest, but was not formally adopted into KW's ARC. Despite this technical deficiency, the plaintiff was provided a copy of the Behavior Intervention Plan and was generally aware of its contents.

Shortly after the distribution of the Plan, plaintiff and other staff members attempted to implement it in response to disruptive classroom behavior by KW. On that occasion, a teacher called plaintiff for support when KW acted disruptively and refused to report to the office. Plaintiff assisted with the removal of the other students in the classroom according to the procedure stated in the Plan. However, KW continued to refuse to voluntarily report to the office. Terry Pollitt, campus security, was called and he and plaintiff physically removed KW from the classroom.

In reviewing the Behavior Intervention Plan, it is clear that it is primarily designed for use by teaching staff dealing with "disruptive classroom behaviors" in a classroom setting such as that which occurred in April of 2001- not necessarily the type of violent behavior which KW exhibited in the lunchroom on September 12, 2001. The only specific reference to violent behavior under the Plan instructs the staff member to make one or more telephone calls for help. The Plan is silent concerning whether it is- or is not-

8

permissible for a staff member to take action to prevent

imminent violent behavior by KW.

Mr. Ernest is not an educator and does not teach at the

CLC. The testimony at the hearing as well as a review of Mr.

Ernest's contract indicate that he was hired to physically run

the facility, and to provide backup discipline/authority by

drawing on his law enforcement background when necessary.  Mr.

Ernest testified that he was never provided a written list of

duties prior to his termination.  However, the defendants

submitted a two-page job description in which specific duties

listed included providing "daily security" as well as

"*assisting and handling assaults*, theft, bomb threats,

weapons, alcohol, drug incidents." Ex. 2 (emphasis added).  As

Mr. Ernest explained, the teachers and counselors were in

charge, but when they had difficulties, they would call Mr.

Ernest.  Until the summer of 2001 when a "head teacher" was

appointed to take over "discipline" at CLC, the plaintiff

filled that role.  In addition to his law enforcement

background and "on-the-job" training in the school system, Mr.

Ernest was trained in safe physical management techniques

{"SPM"] by the Department of Juvenile Justice in the spring of

1998.  Mr. Ernest subsequently was asked to train others in

the same techniques in the summer and fall of 1998.

Mr. Ernest knew KW to be an "extremely disruptive" student from the time he was admitted to the CLC in the fall of 2000.  KW was described as being among the most disruptive and most violent students at the CLC, and his behavior was the subject of discussion "on a day-to-day basis."  Others described KW as having traits characteristic of oppositional defiant disorder, ("ODD") although KW had no formal ODD diagnosis.[2]

KW's history of violent and disruptive behavior included at least one incident involving the plaintiff in the late fall of 2000.  KW had been in the secretary's office for disruptive classroom behavior when he walked up and struck plaintiff in the chest with clenched fists for no apparent reason.  Plaintiff testified that the police were called and that criminal charges were filed against KW on plaintiff's behalf arising out of that incident.

**A Volatile Situation**

Mr. Ernest provided testimony as well as a written explanation of the events on September 12, 2001.  On that day, students KW and JM were involved in an altercation, shoving

_____

[2]An incident report dated September 24, 2001 incorrectly states that "[m]ultiple reports found in KW's file identify him as an Emotional Behavioral Disordered student with Oppositional Defiant Disorder (ODD)and Attention Deficit Hyperactive Disorder (ADHD)."  Ex. 6.

10

and cursing as they entered the lunchroom.  Plaintiff asked
them to stop and initially turned and walked away from the two
students.  He returned when his attention was drawn by an
obviously escalating verbal exchange between the two at the
table at which both had placed their lunch trays.  Plaintiff
testified credibly that the two boys appeared to be on the
verge of a physical fight, with JM threatening to accost KW if
plaintiff did not remove him from the scene, and KW continuing
to make a variety of verbal threats.  Plaintiff asked JM to
step away from the table; he complied and did not again
verbally threaten KW.  In contrast, KW continued to make
verbal threats, swearing and showing signs of increasing
agitation.

     Perceiving KW as the aggressor, plaintiff asked KW to go
to his office.  KW responded with vulgarities and refused to
comply. KW repeated his vulgarities and within short order,
partially stood up in what plaintiff reasonably perceived to
be an attempt to fight JM.  Although KW sat back down, he
continued to be extremely agitated. Plaintiff repeated his
request that KW report to the office. Within seconds, KW stood
up again and slammed the chair against the table while
continuing to project a vociferous stream of vulgarity toward
plaintiff and/or JM.  At the same time, KW balled up his fist

11

as if to strike plaintiff or JM and moved as if to go around plaintiff. Believing that KW had the immediate intent to cause injury, Ernest planted himself near KW, creating a physical barrier and continuing to verbally direct KW to calm down and go to the office.

Upon observing KW balling up his fist, Mrs. Williams quickly went to the office to call security and the Paris Police Department. Defendants' Exhibit 29 is a written statement from Mrs. Williams which corroborates this account, reflecting that KW "started yelling at Mr. Ernest..." and subsequently "drew back his fist at Mr. Ernest."

When KW continued to move as if to go around plaintiff, plaintiff placed his hand on KW's arm to restrain him and/or to lead him to the office.[3] KW jerked away in what plaintiff believed to be an attempt to continue to move toward JM. Shortly thereafter, plaintiff placed both hands on KW's left and right biceps in what was described by some witnesses as a "bear hug" restraint. During KW's struggle to break free of

_____

[3]At the hearing, plaintiff stated that he placed his hand on KW's arm to restrain him. On the day of the altercation, Orin Simmerman's notes reflect that plaintiff stated that he "grabbed him by [the] arm to lead" him to the office. In a written account dated September 25, 2001, plaintiff states that he placed his right hand on KW's left bicep and told him to come to the office when KW tried to get around plaintiff to move toward JM. I do not find these slight variations in plaintiff's account to be significant.

12

plaintiff's hold, both plaintiff and KW lost balance and fell
to the floor.  Both quickly stood up again, with KW continuing
to use threatening words and gestures.

Plaintiff again placed his arms to restrain KW, telling
him that if he did not stop plaintiff would place him on the
floor.  When KW continued his violent words and actions,
plaintiff physically placed KW on the floor.  In response, KW
ceased resisting and stated that he would comply with
plaintiff's instruction to report to the office.

The entire incident took approximately 2 and half
minutes, and was recorded on videotape.  The videotaped
footage is of poor quality, but essentially corroborates the
details of the incident as portrayed by plaintiff and other
witnesses.  Unfortunately for plaintiff, the grainy quality of
the footage and lack of sound can - and apparently in this
case did- result in some confusion concerning what actually is
being shown.  However, numerous eyewitness accounts
corroborate plaintiff's version of the events.

Defendants' Exhibit 14 contains handwritten summaries of
student eyewitness accounts.  Several students indicate that
KW was angry and both physically and verbally defiant,
swearing and "swinging" before plaintiff "picked him up and
laid him on ground."  Student accounts emphasize the

13

plaintiff placed KW on the ground in a manner that was "[n]ot violent" and "[n]ot hard enough to hurt him." Although one student reported observing violent actions by plaintiff, that student admitted his view was obscured, and his account was contradicted by others and the videotape.

Especially enlightening is the eyewitness account of Sandra Morgan, a witness who is now deceased. Ms. Morgan, a certified clinical social worker who was employed as a therapist at CLC, initially authored an internal file memorandum the day of the incident. Her memorandum first describes the confrontation between JM and KW which led up to plaintiff's actions, and then describes plaintiff's response:

> During the lunch period, confrontation occurred between [KW] and [JM]. .... At this point, Mr. Ernest attempted to intervene. Mr. Ernest asked [KW] to leave the lunch area and go to his office. [KW] refused. Mr. Ernest asked him more than once, and [KW] adamantly refused. KW was extremely angry (face was red, face muscles clenched, fists clenched). [KW] continued to make some type of oppositional remarks. Mr. Ernest attempted to remove [KW] from the situation by taking hold of his arm. *It was then necessary for Mr. Ernest to implement SPM, as he could not de-escalate [KW].* [KW] then proceeded to walk to Mr. Ernest's office. Security arrived per telephone contact from Ms. Williams, as well as [KW]'s grandmother. *It is in staff opinion that [KW]'s removal was necessary to prevent [JM] and [KW] from proceeding into a physical altercation, which would have resulted in both boys being injured, as well as inciting the other students.*

14

*See* Exhibit attached to transcript from 11/16/01 (emphasis added). Ms. Morgan testified in conformity with this written account at the prior hearing:

> Q. Okay. It would still be your impression that –
> simply put, that [KW] was not to be de-escalated
> here.
> A. Exactly.
> Q. Was it your opinion and belief that he was about
> to start a fight?
> A. It was – well, between him and the anger of the
> other kid, that was probably what was going to
> happen.
> ...
> Q. Okay. Did you ever see Mr. Ernest during his
> approach to [KW] do anything that you would consider
> was inappropriate in attempting to defuse the
> situation?
> A. No.
>
> ....
> Q. Did you see Mr. Ernest physically take hold of
> [KW]?
> A. It looked to me like he was trying to take hold
> of his arm to escort him away – out from that area
> towards his office. And [KW] did not want to do
> that. And it kind of looked like he more or less
> just restrained his arms to keep him from hitting or
> fighting. And it happened really fast. But the
> next thing is they were down between the tables.
> And it looked – I kind of moved up closer. And Mr.
> Ernest basically was kind of down on one knee and
> holding [KW] to keep him from fighting.

[TR. at 90-97].

KW was subsequently charged by local police with terroristic threatening, abuse of a teacher/administrator, disorderly conduct, and assault in the fourth degree. KW ultimately pleaded guilty to all charges.

15

In a letter dated September 18, 2001, Superintendent Carter described the same incident as follows:

> Two students were involved in a verbal argument
> concerning who had arrived at a desk for lunch
> period.  The two students were arguing when you were
> asked to intervene by one of the students at the
> CLC.  After only seconds of discussion between you
> and the student in question, the student then began
> to walk away.  At that time, you grabbed the student
> by the arm and attempted to restrain him from
> departing.  When he attempted to pull away from you,
> you grabbed his upper body and attempted to wrestle
> him into submission.  In doing so, you wrestled him
> to the ground.  When he was able to escape from your
> initial attempts, you wrestled him to the ground a
> second time.

Exhibit 4.

I find the description provided by Superintendent Carter to be a serious mischaracterization of the events in question.

Superintendent Carter's mischaracterization of the event was derived in part from an incident report prepared by Orin Simmerman and John Beardsley.  That incident report concludes:

> Since no weapons or physical assault were reported
> or viewed on film the use of physical restraint
> appeared to have been an unwarranted procedure
> leading to an escalation of a seemingly de-
> escalating situation(the principle antagonistic
> parties already having been separated).
> Additionally, the physical restraint that was used
> appeared to be excessive in nature.

Exhibit 6.  Despite the mistaken conclusions of the incident report, the authors did not recommend any punishment for Mr. Ernest, instead recommending that Mr. Ernest be recertified in

16

noninjurious physical restraint, and that all staff undergo additional training.

At the hearing, plaintiff testified that he believed the situation to be "volatile" and "dangerous." I concur with this assessment, and disagree with the defendant's characterization of the situation as one which had "de-escalated." It is worth noting that none of the three school officials (Beardsley, Simmerman, Carter) who made the mistaken judgments concerning plaintiff's actions had any training in SPM techniques.

KW's profanity, verbalizations, and physical actions indicated volatility rather than stability. Witness Debbie Williams testified that KW's face was getting very red, that she was aware that his "temperature went up real fast," and that she had the sense that KW was "about to hit another student" or plaintiff. Ms. Morgan testified similarly that KW's demeanor demonstrated increasing anger and an increasing likelihood of physical violence.

Although Sandra Morgan and Debbie Williams both were nearby, neither took action to clear the room of other students including JM. To the extent that the Behavior Intervention Plan addressed KW's behavior on September 12 at all, the room-clearing technique could only have been

17

reasonably implemented by other staff members, and not by plaintiff. Various witnesses testified that Morgan and/or Williams could have and should have called Terry Burchett and/or implemented the Plan by clearing the room during the altercation. Carter, Vol I, TR at 100; Simmerman, TR at 45-48. Plaintiff clearly was fully engaged in preventing KW from taking violent action against plaintiff and/or JM during the course of the two and a half minute period in question, and could not reasonably have been expected to do more. This conclusion is supported by the testimony of plaintiff's expert, Michele Foley.

In addition to incorrectly assessing the situation as one in which KW was stable and calm, the defendants incorrectly assessed plaintiff's actions as overly violent. The defendants were particularly critical of plaintiff's alleged failure to use SPM techniques. Again, I disagree with defendants' factual conclusions. Defendants' own expert agreed that the plaintiff used appropriate "buffering" and "corralling" techniques at the outset of the confrontation as well as verbal commands.

**SPM and Plaintiff's Actions**

The specific action with which defendants disagreed was plaintiff's use of force to place KW on the floor. The

18

defendants appear to have been particularly concerned with
KW's medical diagnosis of scoliosis.  However, there was no
testimony that KW had any physical limitations as a result of
that diagnosis, or that any staff members were instructed at
any time - through the Behavior Intervention Plan or otherwise
- that certain techniques should not be applied to KW.  Nor
was there any evidence presented that the techniques actually
applied by plaintiff caused any physical harm to KW.

In her first-hand account, Ms. Morgan testified at the
November 2001 hearing that the plaintiff used SPM techniques
designed to prevent KW from causing physical harm to himself
or another student.

> Q.  Explain, if you will, how safe physical
> management is to be exercised.
>
> A. Well, in this case, because KW was - he's not a
> small kid - But as far as Mr. Ernest trying to hold
> his arms to keep him from lashing out and hurting
> him or anybody else, that's kind of what I was
> meaning.  Like there were no like fists thrown or
> anything like that.  It's just kind of like a
> restraint type thing and then to take him down.

In addition to the first-hand accounts by plaintiff and
observing witnesses, the testimony of expert Michele Foley
confirms that appropriate techniques were used.

Although defendants presented the testimony of an expert,
Greg Abate, who reached a different conclusion, I did not find
Mr. Abate's opinion to be persuasive for several reasons.  Mr.

19

Abate did not testify that a different course of action would have avoided the need for physical force.  Rather, he testified only that different actions "very possibly" could have avoided the need for the amount of force used and/or that different techniques would have created "less likelihood" of violence.

According to Mr. Abate, plaintiff's initial arm touch "escalated" the situation.  However, Abate's testimony was based upon a mistaken belief that KW was calmly seated at the time.  The testimony of witnesses indicates that KW was anything but calm, and that the situation was both volatile and escalating.  Moreover, witness accounts and the videotape support the court's conclusion that physical contact between plaintiff and KW occurred only after KW moved as if to get around plaintiff.[4]

Mr. Abate was not familiar with the Department of Juvenile Justice [DJJ] training provided to plaintiff.  Mr. Abate advocated the use of an "upper torso maneuver" and was unaware that the technique has not been used by the DJJ since 1998 due to its high-injury rate.

---

[4]The court has replayed the videotape numerous times.  While blurred and difficult to decipher, the imagery supports plaintiff's position that KW briefly rose in his seat, then sat again, then rose again and slammed his chair against the table.

20

In contrast to Mr. Abate, plaintiff's expert developed the training program for the DJJ - the entity that trained plaintiff in SPM techniques.  Ms. Foley testified credibly that SPM techniques sometimes require adaptation based upon limitations of space.  Concerning the incident in question, Ms. Foley testified that the physical space involved was too small and too crowded an area with tables, desks and chairs for plaintiff to employ the full range of available SPM techniques.  Although the technique used by plaintiff was "not exactly" an SPM technique, Ms. Foley  described it as the best available to plaintiff given the physical environment.  Ms. Foley's testimony provides further support for this court's conclusion that plaintiff acted reasonably to prevent an imminent physical altercation.

**Restraint Versus Discipline**

Correlated with defendants' incorrect assessment of plaintiff's use of physical force is defendants' incorrect characterization of plaintiff's actions as improper "discipline."  Clearly, there was no "discipline" imposed by plaintiff on KW, other than the appropriate intervention to prevent KW from assaulting another student.  Ironically, the list of written duties provided by defendants required plaintiff to provide "security" including "*assisting and*

21

*handling assaults.*" Exh. 2.

In sum, although it is possible that plaintiff could have made different choices in the heat of the moment to call upon other staff to clear the room, or to use a slightly different SPM technique, there is no evidence that the actions plaintiff took to maintain safety during a fluid and volatile altercation violated KRS §161.011(7).

**Unstated Considerations**

In addition to over-reliance on the blurry videotaped image, which lacked the context of sound and visual details such as KW's reddened complexion and clenched facial muscles and fists, the defendants' perceptions appear to have been colored by concerns that KW would file suit over the incident. See TR at 150 (Beardsley testimony at 11/16/01 hearing that Board and he were concerned that KW and/or his parents would sue defendants over the actions of Mr. Ernest); Carter deposition, TR at 88-89.  Defendants' perceptions may have been further influenced by concerns that the CLC should not be directed by someone in law enforcement, but instead by someone with a school administration or principal certification. Simmerman deposition, TR at 16; Carter deposition TR at 47. Regardless of these other considerations, the evidence simply does not support the defendant's conclusion that the plaintiff

22

violated KRS §161.011(7).

**IV.  Conclusion and Recommendation**

**Accordingly, IT IS RECOMMENDED THAT** the district court find and conclude:

1.  To the extent that a post-termination hearing was required by due process, it has now been satisfied through the hearing held before this court in Lexington on February 7, 2005;

2.  Plaintiff's conduct on September 12, 2001 during the course of the incident with student KW did not violate KRS §161.011(7) and therefore did not justify disciplinary action by the defendants;

3.  The defendants have failed to demonstrate, by a preponderance of the evidence, that plaintiff's early termination was justified.  The reasons provided by defendants were not valid and sufficient under applicable state law.

**OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of the same or further appeal is waived. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).  Poorly drafted objections, general objections or objections that require a judge's interpretation should be afforded no effect and are insufficient to preserve

23

the right of appeal.  *See Howard v. Secretary of Health and Human Services*, 932 F.2d 505, 509 (6th Cir. 1991).  A party may file a response to another party's objections within ten (10) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b).

This 7th day of March, 2005.

Signed By:

*J. Gregory Wehrman*

United States Magistrate Judge